## MOORE *vs.* MOORE.

### *In the matter of proving the last will and testament of* ELIZABETH MOORE, *deceased.*

THE reading of the will in the presence of the testator and the subscribing witnesses, and its subscription by all the parties in the presence of each other, is ordinarily sufficient evidence of a testamentary declaration, and of a request to the witnesses to attest the instrument. The minds of the parties meet on the essential points, through the medium of the reading, and acquiescence or consent to the attestation. No particular form is requisite in these respects, except that the testator shall communicate to the witnesses that it is his will, and he desires them to attest it. This can be done by reading and other acts, performed by a third person, provided an intelligent assent on the part of the testator be shown.

The will of a testatrix eighty-seven years of age sustained—there being proof of sufficient legal capacity, and of an intention in favor of the beneficiary expressed at the time of making the will, as well as previously and subsequently thereto. Where there is some evidence of a failure of mental power, consequent on advanced age, it is proper to show that the decedent acted with intelligence, and comprehended the effect of what she was doing at the time of the *factum* of the will, and that the provisions of the instrument were in consonance with her wishes and intentions expressed at other periods.

J. VAN BUREN *and* H. W. ROBINSON, *for next of kin.*

I. The testatrix, at the date of the execution of the will, was not of sound and disposing mind and memory.

II. The will has not been proved to have been duly executed. (2 *R. S.*, 63, § 40.)

1st. It was not declared by Mrs. Moore to be her last will and testament, in the presence of two witnesses.

2d. Neither of the witnesses, Mr. and Mrs. Searle, were requested by the testatrix to witness the same. The only request for them to do so was from Alfred Moore, the beneficiary legatee, and not in the presence of the testatrix. Both swore positively that the testatrix made no request to them of any kind, and made no remark in their presence except in reply to an inquiry, of Gen. Sandford, if it was satisfactory. Gen. Sandford's recollection of the transaction is so indistinct as not to be relied upon.

III. At the time of the execution of the will, the sole legatee who gave the instructions for drawing the will, was the trustee and sole managing agent of the testatrix. Under these circumstances, the law raises a presumption of fraud and undue influence which it requires the strongest evidence to overcome. (*Wharton* vs. *May*, 5 *Ves.*, 27; *Gibson* vs. *Jeyes*, 6 *Ves.*, 279; *Welles* vs. *Middleton*, 1 *Cox*, 112; *Marsh* vs. *Tyrrell*, 2 *Hagg*, 110; *Bridgeman* vs. *Green*, *Wilmot*, 70; *Ingram* vs. *Wyatt*, 1 *Hagg, E.* 441; *Baker* vs. *Batt*, 1 *Curteis*, 125; *Barry* vs. *Butlin*, 1 *Curteis*, 638; *Croft* vs. *Day*, 1 *Curteis*, 839; *Sears* vs. *Shafer*, 1 *Barb. S. C.*, 408; *Crispell* vs. *Dubois*, 4 *Barb. S. C.*, 393; *Brice* vs. *Brice*, 5 *Barb. S. C.*, 533.)

This presumption is strengthened,—

(*a*) By the feeble and helpless mental and bodily condition of the testatrix and her entire incapacity to transact business:

(*b*) By the fact that the testatrix was taken, on the death of her husband, to the house of the legatee, and remained an inmate of his family, and under his exclusive control, to her death. She was never outside of the house but twice, during the whole time:

(*c*) By the absolute secrecy preserved in regard to the whole transaction.

It is not overcome by any proof that the testatrix ever spoke of making or having made a will.

IV. The most that can be claimed from any view of the evidence is that testatrix intended to *advance* to Alfred Moore, during her life, moneys to assist in building his house; and whether this should be treated as a gift or an advance will become a proper subject for inquiry on the final settlement of her estate.

C. W. SANDFORD, *for Executor.*

THE SURROGATE. The first question that arises in this case is, whether the will was executed in the mode prescribed by statute. All the witnesses testify to the subscription of the testatrix in their presence, and their attestation in her presence. One of them, Mr. Searle, on his direct examination said, that Mrs. Moore acknowledged it as her will, and requested the witnesses to attest it. On his cross-examination he stated that when he went *into* the room Alfred Moore and Mr. Sandford said they wished him to sign his name—the precise words used he did not recollect —no one else spoke to his knowledge—nothing more was said while he was in the room. He immediately qualified this statement, however, by adding "I did not hear any thing more. I don't recollect Mrs. Moore saying much. I think she said it was her wish he should have that sum of money. If my memory serves me right, those were the words she used. I think I can be positive she said so. I have an indistinct recollection of what was said at that time. That is all I recollect hearing Mrs. Moore say while I was in the room. I am not able to say whether she said anything else or not. She addressed no remark to me, nor asked me any question nor gave me any direction. I am positive of that." * * * "I don't recollect any thing else that was said or done while I was in the room. I can't recollect whether the will was read while I was there. When I came in, the will was on the table." He then testifies to the signature of the will, and proceeds: "We were all round the table—we could hear all that was said. * *

\*   I don't recollect that Mrs. Moore said any thing to my wife while she was in the room. She might have asked her how she was. I don't recollect any thing more. Mrs. Moore made no request of my wife, nor gave her any directions." \*   \*   \*   "The decedent made no request of Gen. Sandford while I was there, nor gave him any directions —not to my knowledge." \*   \*   \*   "I never witnessed any other will besides this." On further examination Mr. Searle said, that before the will was signed it was read by Mr. Sandford, in his ordinary tone of voice, at the table where it was executed, and in the presence of all the parties. He also said, "I cannot tell either the words or the substance of what the decedent said when I was in the room. I do not recollect even the words or the substance of any thing she said. I could not tax my memory with a single observation. I am perfectly unable to state any thing she said. I recollect distinctly the fact that Gen. Sandford read the will. I do not now recollect the precise contents of the will. On looking at the will, I recollect that he read the attestation clause. I think that was before I signed it, but could not be certain." \*   \*   \*   "I think decedent had not signed the will when Mr. Sandford read it." I don't recollect that she said any thing when he read it." \*   \*   \*   "I am not aware that anybody spoke, after the will was read, before it was signed."

Mr. Searle's wife, one of the other attesting witnesses, states that she was present at the execution. She says, "I saw Mrs. Moore go to the table, and make her mark. I think so. I cannot be very sure—I did not take any notice. She said it was correct. I think I heard some part of the will read before I signed it. I cannot say what part—I do not understand these things. I did not take any notice. \*   \*   \*   I think Mr. Sandford asked her, when she signed it, if it was satisfactory; and she said, Quite so, or to that purport." On cross-examination the witness said, "The decedent said nothing to me while I was in the room. She made no other remark except what I stated on my direct

examination—not that I recollect.  I was near enough to hear."  *  *  *  "The only remark Gen. Sandford made to Mrs. Moore was, whether it was satisfactory, and she said, Yes.  He made none to me or to my husband."  *  *  * "Mrs. Moore said nothing about Alfred while I was in the room, when the will was executed."  *  *  *  "The day after the will was executed she said, 'I hope I did not fatigue you coming down stairs last night.'  I answered, 'Oh, no;' and then she said, 'Thank God! that's over.'"

The will bears date November 7th, 1848, and these witnesses were examined three years afterwards.  The instrument is very brief.  The *testatum* clause is full and formal. Mrs. Searle thinks she heard some part of the will read before execution, while Mr. Searle states more positively his recollection that the whole was read, including the *testatum* clause.  The reading of the instrument in the presence of the testator and the subscribing witnesses, and its subscription by all the parties in the presence of each other, is ordinarily sufficient evidence of a testamentary declaration, and of a request to the witnesses to attest the instrument. The minds of the parties meet on those two essential points, through the medium of the reading, and acquiescence or consent to the attestation.  No particular form is requisite; all that the law requires is that the testator shall communicate to the witnesses that it is his will, and he desires them to attest it.  This can be done by reading, and other acts performed by a third person, provided an intelligent assent on the part of the testator be shown.  Indeed, not a word need of necessity be *said*.  A deaf mute might go through all the ceremony, by means of a written communication. Besides, there is generally large room for inference, that the will has been duly executed, from the recitals of the *testatum* clause, where the transaction has not been recent.  In the present case, taking in view the lapse of time, the inexperience of two of the witnesses in matters of this kind, the "treacherous memory" of one, if not of both of them, and the fact that the *testatum* clause of the will was read aloud

before it was subscribed by the testatrix and the witnesses, I think there is quite sufficient ground to admit it to probate. There are cases in which probate was allowed on proof far less satisfactory. ( *Vide* cases cited in *Peebles* vs. *Case*, *ante*, *p*. 242.)

But in addition to the evidence I have examined, we have the testimony of the counsel who prepared the will, attended its execution, and became a subscribing witness. He states that he read the instrument to the decedent, and then requested Alfred Moore to send for two persons to witness it. He left the room, and returned saying Mr. and Mrs. Searle would attend; and they shortly after came in. He requested the decedent to sign the will, and she asked him to write her name. This was done, and she then made her mark in the presence of the witnesses. He says, "I then asked her if she published and declared this as her last will and testament, and wished us to subscribe it as witnesses. She said, Yes, and made some remark, I don't recollect precisely what. I then read the attestation clause, and the witnesses signed it in her presence." This evidence is explicit and positive, and removes any question as to the testamentary declaration and the request to the witnesses to attest the instrument. Thus, besides the reading of the *testatum* clause and the act of signing by all the parties in the presence of each other, here is precise testimony to a formal inquiry of the testatrix by the attending counsel, and the answer in the affirmative. The witnesses all agree that some part of the paper was read aloud; and if, in regard to other circumstances, Mr. and Mrs. Searle's recollection does not accord with that of Mr. Sandford, I think greater reliance may be placed on his statement of the transaction than on theirs. Their recollection was evidently indistinct as to what was said; they no more agree with each other on that point, than they do with him. But in regard to acts—the reading of a part of the will, the signatures, and that the testatrix said *something* in relation to the instrument, to Mr. Sandford—they all concur. I think the facts

and circumstances upon which they agree, sufficient to prove valid execution and justify sentence of probate ; and this conclusion receives confirmation from the direct evidence of Mr. Sandford.

I next proceed to review the testimony in respect to the capacity of the decedent. She was an old lady, who had resided with her husband at his house in Batavia street until his death, June 23, 1848. Shortly after that occurrence she went to live with her son Alfred, at his residence in the Third Avenue, where the will was made in November, 1848. In April, 1849, she removed to a new house built by Alfred in Twenty-second street, where she remained until her decease.

Mrs. Conover, of Rahway, states that in the summer of 1846, she had frequent opportunities of seeing Mrs. Moore, who was then on a visit at the house of her son Joseph. She saw her daily, and says she was very childish—forgot who the witness was—did not know one of her grandsons—had her food cut for her—was never left alone.

Mrs. Trembly, of Rahway, was in the habit of seeing Mrs. Moore, some years before her decease, when visiting her son Joseph in the summer season. She considered her conversation like that of a child, though she did not recollect any thing said by her that was foolish. "She would imagine she saw things—think she would see some one coming, and would call Frances. She had her basket, with little rolls, and would lose some of them and would call Frances to look after them. * * * When she imagined some one was coming out doors she would not be satisfied it was nobody, till Frances came and looked out. * * * That was about four or five years ago." The witness last saw Mrs. Moore in May, 1848, at her house in Batavia street. She says, " She knew me when I came in; she inquired about Frances and her son Joseph. * * * She was the same as she was before ; she appeared to be a child in her conversation and actions." On cross-examination Mrs. Trembly, said that at this visit

she did not hear her say, or see her do, anything that was childish or foolish.

Eliza Dunham saw the decedent at Rahway, when visiting her son Joseph. She also called on her, with Mrs. Trembly, in May, 1848. She says, "She asked me my name three times over, when I was sitting at the table; she ought to have known me. * * * She would take hold of her dress, and say it was pretty; it was not any thing fine. I recollect her saying she and her husband were poor. She had a basket, and would take a little roll up, undo it, roll it up and put it back again. She had her glasses in her hand, and would ask for them."

Mr. Zabriskie, the stepson of William Moore, was in the habit of seeing the decedent two or three times a week, in 1845, and subsequently to that period, three or four times a week. He says she talked in a childish manner, and was checked by her husband. He states that on the sixteenth of October, 1848, he and his stepfather visited Mrs. Moore at the house in the Third avenue; that William " shook hands with his mother, and she did not know him; she wanted to know who he was ; he said he was her son William. Then I went in and shook hands with her, and she did not know me; William told her who I was ; then we sat down on the sofa. Then she asked William where father was—when he would be back, and if we had seen him that day; and William told her, No ; that father was dead. Mr. Moore had died June 22, previous. She said she could hardly believe it; but, as he said it, it must be so. Mrs. Alfred Moore was there at that time, and present at this converversation. She said that mother—Mrs. Moore—often asked about father; where he was ; what had become of him, she did not see him." This witness called on Mrs. Moore afterwards, in 22d street, and states that she did not know him, but when she was told who he was, inquired and talked about his father and the members of his family.

Sarah O'Donnell visited the decedent in May, 1849, and says, " She bade me look at things in the yard—geese:

there were none there." She adds, that she saw her again in the succeeding August, when she did not know her; thought she had five sons; talked as if she were poor; imagined she saw a man on the floor.

John Carter lived in the same house with Mrs. Moore, in 1833 and 1834, for eighteen months, and called to see her two or three times afterwards. At a visit in 1846, he states that she appeared to be childish; did not know him; and it took her husband some time to make her understand who he was.

This is the substance of the testimony against the capacity of the decedent:

1st. Memory.—Mrs Conover states that, in 1846, she forgot who she was, and did not know one of her grandsons who came to make a visit at Rahway. 2. Mrs. Trembly says, that she knew her when she called at her house in 1848. 3. Mrs. Dunham testifies that, on the same occasion she did not know *her*, and asked her name several times; and that she asked for her spectacles, when she had them in her hands. 4. John Carter says, she did not know him in 1846; and 5. Sarah O'Donnell, that she did not know her in August, 1849. Mrs. Conover was an acquaintance of a few months, in 1846. Mrs. Moore had seen her grandson two months before; but how long a time had elapsed before that, since she had seen him, does not appear. Mrs. Trembly, whom she had only known when visiting at Rahway, was recognised by her in 1848, after a lapse of two years since they had met. Eliza Dunham whom she did not know in 1848, had seen her at Rahway in 1842 and 1846, half a dozen times on each occasion. John Carter had not seen her over two or three times, the dates of which are not fixed, since 1834. Mrs. O'Donnell never saw her but three times, prior to August, 1849. The decedent was about eighty-four years of age when she executed the will, and we are to look for some loss of mental activity and vigor at that advanced age. At that period, the memory, in respect to recent events and new acquaint-

ances, receives but fugitive impressions. Even upon the evidence of the contestants, exclusive of the testimony of Mr. Zabriskie, I think it very far from being established that Mrs. Moore's memory, at the date of the will, was so feeble, as to render her incapable of a testamentary act. Mr. Zabriskie testifies that, on the 16th of October, 1848, about three weeks before the execution of the will, she failed to recognise her son William, and did not remember that her husband was dead. If he has fixed that time correctly, it is the only single occasion before the will was made, in which her memory is shown to have failed in regard to her husband and her children.

2d. Childishness. This is a convenient phrase for questioning the mental vigor of aged persons, though perhaps it is the only mode of indicating a state of the mind peculiar to a certain period of life. It expresses, however, merely the opinion of the observers, and unless supported by facts, has weight only as an opinion worthy of more or less attention in proportion to the opportunities enjoyed for observation. No circumstances have been stated, showing unsoundness of understanding in the decedent; her turning over the rolls and work in her basket, and calling her dress pretty, are hardly substantial enough indications of imbecility, even were there no other proof in the case respecting her mental condition.

3d. Optical Delusion. Mrs. Trembly testifies that in 1846, two years before Mrs. Moore executed the will, whilst visiting her son at Rahway, she imagined she saw some person coming to the house, and would not be satisfied until her daughter-in-law, Frances, came and looked out. As I shall examine this subject further hereafter, it is sufficient at this point to say, that such delusion may exist in a sound state of mind.

On a review of the evidence for the contestants, then, the only important fact tending materially to an impeachment of the capacity of the testatrix, is that stated by Mr. Zabriskie. It undoubtedly shows a weak and failing mem-

ory; but the evidence. of the other witnesses for the contestants, in connection with his own statement concerning conversations with Mrs. Moore, show that there was not an entire loss of memory. Mrs. Trembly, though a casual acquaintance formed at Rahway, was recognised by her in 1848, two years since she had seen her; and yet a few months afterwards Mr. Zabriskie states that she did not know her own son. If he states the time of this circumstance correctly, the case certainly calls for further proof; for although there may not have been absolute incapacity, yet the party propounding the will, should go further than evidence of mere formal execution. He should afford more light as to the state of the decedent's mental faculties, and should show that she acted with intelligence and comprehended the effect of what she was doing at the time of the *factum* of the will. Upon this point, quite a number of witnesses were examined, some of whom only occasionally visited the decedent, and others lived in the same house with her, in the habit of daily intercourse and conversation.

Mr. Searle, one of the subscribing witnesses says, he considered Mrs. Moore "perfectly sane and capable of carrying on and transacting any business." He never saw her transact any business, but she had lived in the same house with him over four months before the will was executed. He says, "I saw her daily, and spoke to her daily; I never knew her confined to her bed during that period; * * * during that period I never perceived anything irrational or exhibiting a want of mind on her part. When the will was executed she was in about the same state of health as before. She continued to reside there till May, 1849; her health and habits continued about the same; I saw no difference. I was in the habit of calling in to see her and converse with her, almost every day." "Her memory appeared to be good." About a year after she removed from his house, he states, that he first observed any indications of her being irrational.

Mrs. Searle states, that the decedent's "mind was quite

good when she signed the will." "I saw her two or three times a day, sometimes; her health was very good at that time; I never knew her to be confined to her bed during the time she lived there. I never saw anything like insanity or derangement of mind, while she lived there. She has come up stairs and sat with me four hours or more; she conversed very freely and cheerfully. As far as I knew, her memory was good. She did not talk with me about her family very often. I had no reason in the least, to suppose there was any unsoundness of mind about her, during the period she lived at the house." Mr. Birch, who visited Mr. Searle, and became acquainted with the decedent whilst residing there, frequently had short interviews with her. He says, " Her conversation was always sensible," * * * " there was nothing in * * * her language, conduct or appearance, to indicate the least imbecility of mind." Mr. Cook, a brother-in-law of Alfred Moore, states that in the month of August, 1848, he stayed at the house in the Third avenue, about a week; he saw and conversed with the decedent daily, and observed " nothing peculiar in her appearance, manner or conversation." Mrs. Reeder, the wife of Mr. Moore's agent, and who lived next door to Mr. Moore's house in Batavia street, was in the habit of frequent intercourse with Mrs. Moore, to the time of her husband's death, and visited her when she lived with Alfred, once in the Third avenue and three times in Twenty-second street. On these occasions she always knew her " remarkably well." The visit at the house in the Third avenue, was in April, 1849, and lasted about two hours. At this and subsequent interviews, she says she found her perfectly sensible. She mentions several circumstances showing the state of her memory, which, she says, " appeared very good."

Ann Moore, an old lady residing with Alfred Moore, and the half sister of the husband of the decedent, lived with old Mr. Moore in Batavia street, for several years, till after her brother's death. She again lived with the decedent at

Alfred's house in Twenty-second street, from May 1849, till she died. She visited Mrs. Moore frequently in the Third avenue, sometimes spending a whole day with her. She states that her memory, while in the Third avenue, was "pretty good ;" she " knew all her acquaintances ;" and the first time she observed her memory to fail, was in the summer of 1849. The first she observed of the optical delusions, was when Mrs. Moore lived in Twenty-second street.

Dr. Wilsey, who had been taught by the decedent when a child, renewed his acquaintance with her in June, 1848, when he was called in to attend her husband in his last sickness. At that time and in the ensuing September, he saw and conversed with Mrs. Moore several times. On December 30, 1848, he commenced attending Alfred Moore's family, and made seven visits in January, 1849, four in February, six in March, three in each of the months of April, June, July and August. Eighteen visits were afterwards made at various intervals, until March 15, 1850, when he was requested by Alfred Moore to attend his mother, which he did till her death. As to the state of her mind in 1848, he says : " I did not perceive anything out of the way, as to her mind or recollection.   *   *   I did not talk upon general events more than regarded relatives, and circumstances of early life. Her recollection in that respect was accurate ; she had been a teacher at the period I first knew her ; her conversation was entirely rational ; I did not perceive or mistrust anything at that time." In respect to her mental condition in 1849, he says : " I perceived nothing peculiar in her mind or conversation.   *   *   I never knew her to be sick at that time, and she was a woman of good constitution."

In November, 1850, the decedent was seized with a fit of apoplexy, from which, however, she partially recovered ; and she lived until October, 1851. The Doctor states explicitly, that prior to March, 1850, he " did not mistrust any aberration of mind ;" that from 15th March, to No-

18

vember succeeding, he " perceived some change of mind in very trifling particulars,   *   *   *   *   occasionally a vacancy of mind; with the exception of that, her faculties seemed good.   *   *   *   After the stupor in November, 1850, she imagined she saw objects which she did not see. She would not go to bed sometimes, saying there were people in bed.  I can't recollect anything of the kind before. I think there was not.  I feel pretty positive about it.  The vacancy I discovered in March, 1850, was that she wanted to go to her house in Batavia street; she said, I want to go home ; I asked, Where ! She said, In Batavia street, where I live—this place does not look like home."  " I perceived no indications of impaired or weakened intellect, or of what is called childishness, up to March, 1850.  She was rather a dignified old lady."

Mr. Phinney became acquainted with Mrs. Moore, at the funeral of her husband ; saw her once in three or four weeks from that time, till April, 1849 ; and then for about eleven months lived at Alfred Moore's house in Twenty-second street.  He describes the decedent as conversing fluently and intelligently, and states, that he first observed a change in August or September, 1849.   He says, " It was an optical illusion more than anything else ; she saw a great many children, persons, horses and carts, where they were not. At the same time, if I told her they were not there, she appeared to be satisfied.  Before that, I had, I should think, that kind of intercourse with her which would enable me to judge as to the soundness of her mind.  Down to that period, I saw nothing to indicate unsoundness or aberration of mind.  I wish to be understood, that when the optical illusions passed off, her mind was as clear as ever ; they were only for a short time."   *   *   " Her memory was good ; I never saw any indications of absence of memory ; she always recognised me.  I never saw, before the optical illusions occurred, the least failure to recognise persons."   Mrs. Phinney, the wife of this witness and

a cousin of Alfred Moore's wife, lived in the same house, and was in the habit of daily intercourse with the decedent. She says, "When I first went to Twenty-second street, her mind was very good, her memory was good, her conversational powers were very good for the first few months. I could not say when I first observed any change in her, but I think as soon as in July. Her memory and sight began to be affected, &c." * * * * "I never knew her to fail to recognise any person before she had the difficulty in her sight, and then she recognised them when they spoke. * * * I think I noticed no failure in her memory until this defect in sight came on."

Mr. Trowbridge, who formed an acquaintance with the decedent when visiting her son at the house in the Third avenue, and who saw her once in Twenty-second street, states that she always knew him and called him by name, and that he " perceived nothing like a failure of mind." Robert Reeder was agent for the decedent's husband fourteen years. He knew Mrs. Moore very well, and was in the habit of seeing and conversing with her frequently, while she lived in Batavia street. From the time she left there, he did not visit her until May, 1849, when he called at the house in Twenty-second street. She knew him then " perfectly well," and inquired about their old neighbors. He saw her again in the fall; had some conversation, and testifies that he observed no failure of " mind, memory or recollection," on any of these occasions.

Mrs. Blount was a pupil at the school of the decedent, in 1806, and visited her two or three times a year, some years ago. She saw her in the Third avenue but once, in the spring of 1849 ; and although they had not met for two or three years, was recognised by Mrs. Moore, who inquired after her mother and sister by name, conversed with her for some time, and stated that she was going to reside in Twenty-second street. Mrs. Blount subsequently called on Mrs. Moore, two or three times that summer, after she had moved to Twenty-second street. She states that she per-

ceived some "slight defect in memory, but none in intellect," at the interview in the Third avenue; "her mind was active, but her body otherwise;" that during the ensuing summer she observed "no change in her mind but in memory,—her memory failed, but nothing more than * * would be common in persons of her age,"—it was necessary to recall some circumstances to her mind, and then she would recollect them and "speak of them as freely and rationally as ever she did."

Mrs. Robertson, sister of Mrs. Blount, who had once been a pupil of the decedent, and had continued her acquaintance, visited her in company with her mother and sister, in October, 1849, and also a number of times subsequently. On the first occasion, she says, "It was the first time my mother had seen her since Mr. Moore's death.—She spoke of her husband very affectionately, and wished us to go up stairs and see his portrait, to see if my mother would recognise it. She followed us through the entry and tried to go up stairs, and could not; she fell in the entry and partially fainted; she came to; she was perfectly rational. * * I observed nothing like wandering of mind then; I never did; * * I never observed any wandering or deficiency of mind; I did observe a failure of memory."

Besides the opinions and circumstances thus given in evidence, there are some other facts tending to show the state of her mind. Dr. Wilsey states that she showed him some plants and told him the names of several of them; that he often saw her reading; she showed him passages in the Bible; and that she recollected previous conversations. Mrs. Searle saw her at work with her needle. Mr. Birch saw her reading. Mr. Cook says, in August, 1848, he found her reading a book and newspaper, and that in the morning she would take up "The Sun." Mrs. Reeder testifies that, to the death of her husband, she was in the habit of doing her own sewing, mending and washing.—

Mr. Phinney says that she was "in the habit of reading daily and almost constantly," in her hymn books and testament. Although not of active bodily habits, it appears that while she resided in the Third avenue, she was accustomed to go about the house, that she once visited an old friend at the Asylum for aged females, and also went to the Greenwood Cemetery. Indeed, I think the evidence abundantly shows that if before the decease of her husband she was so infirm in body and mind as the contestants insist, she subsequently recovered a larger degree of physical and mental vigor. There is a single instance of optical delusion testified to before her husband's decease; and, though many persons in the habit of constant and familiar intercourse with her have been examined, no similar occurrence is shown from that time until the summer of 1849, more than half a year after the will was executed. It is well known that such delusions may exist without the mind being affected—without derangement or mental hallucination. In cases of insanity, the delusion is in the mind, and the operation of the senses may at the same time be natural and accurate; but where the visual organ, or the nerve, or the brain, is so affected as to present to the mind appearances having no actual existence, the sense is at fault, and the disease may be indicated without necessarily being accompanied by mental derangement. The case of Nicolai, the celebrated bookseller of Berlin, who laid before the Philosophical Society an account of his sufferings from these spectral illusions, is an instance of this kind. Dr. Wilsey terms this malady in the case of the decedent, "a mental defect;" but I do not think he meant to be understood that it was insanity, for he also alludes to its physical character, in characterising it as "an' affection of the brain," coming from "a pressure or congestion of the brain." As to her behavior when she supposed she saw these spectres, Ann Moore says, "I used to tell her she conceited she saw them; she said nothing." * *

" I have taken her out of her chair to the place in the room where she thought she saw men—to satisfy her there was nobody there. When she returned she would think she saw them again, and I would keep on two or three times." Mr. Phinney says : " It was an optical illusion more than anything else; she saw a great many children, persons, horses and carts, where they were not. At the same time, if I told her they were not there, she appeared to be satisfied." * * * * " When the optical illusion passed off, her mind was as clear as ever." Whatever was the nature of this malady, the only symptom of it before the execution of the will, occurred in 1846, and there is no evidence of its appearance again until 1849, when it was indicated only occasionally.

On the whole, unless fraud, undue influence, or imposition be established, I do not think the will should be rejected. Alfred was one of the administrators of his father's estate, and, May 13, 1850, received a power of attorney from his mother. Before that, however, the real estate was sold, Mrs. Moore joining in the deeds with the knowledge of her sons, and the accounts were settled, she receiving one-third of the proceeds both of the real and personal property. In these accounts, she was debited with a large sum of money paid to her ; and the balance on the settlement was paid over to her, and the whole matter closed with the privity of all the parties. It does not appear that in that important transaction her competency to act was ever questioned. Nor is there any proof that Alfred exerted any influence over her mind by any abuse of his position as administrator. We are left, therefore, to determine whether the facts, that the will was executed while she resided with him, that he is a beneficiary to a large amount, and gave the instructions for drawing the will, are sufficient to invalidate the instrument. These circumstances, in the case of an aged lady, certainly require vigilant examination, in order to see that the testatrix acted freely and with intelligence. Mr.

Sandford states, that prior to its execution the will was read to her. She was asked whether it was correct, and replied in the affirmative. The single important feature of the will is the legacy to Alfred, of ten thousand dollars, the remainder of her estate passing as if she had died intestate. It appears that this gift was designed to enable Alfred to build a house. Mr. Sandford states on this point as follows : " Mrs. Moore, when I read the will, said it was as she wished. She then inquired, if she gave Mr. Moore what she intended to give him to build the house, before she died, what the effect of the will would be. I answered that the effect would be to give him the amount twice over. She said she only intended to give him this money to build the house, and she supposed the ten thousand dollars would be enough ; but I don't pretend to recollect the language." Again, " I understood Mrs. Moore the object of this legacy was to enable her son to build a house for himself. She stated that the money would probably be advanced to him shortly, and wished to know what the effect of that would be. I answered, the effect would be to give it to him twice over. To obviate that difficulty, I suggested this paper." The paper in question was then drawn by Mr. Sandford, and signed by Mrs. Moore making her mark. It directs " the executors of her husband's estate to pay to Alfred the amount of the purchase money of the lot lately purchased by him in Twenty-second street from Wm. Menzies, and also the sum he may expend in erecting a house thereon ;" and that the " said sums should be charged to him," on the final settlement of her estate. The facts connected with the execution of this paper not only indicate some reflection on the part of Mrs. Moore, but point out the object of the bequest in question. The intention to make this gift, and the subsequent knowledge on her part of her act in that respect, are established by proof of her declarations at other times, both before and after the will was made.

Mrs. Searle says, " Mrs. Moore had spoken to me before

that time, about what she was going to do—about two months before, she spoke very frequently about it. She said that Alfred had always been a very good boy and very affectionate, and she meant to do something for him if she lived long enough to do it." * * * "Something she had been reading in the newspapers, about some child giving a parent trouble, brought up the subject. She said Alfred had always been a good and affectionate boy. I never heard her speak about her other children. I think I have seen one or two of the other sons at the house once or twice, but I had not much opportunity of seeing whether they came more frequently. The day after the will was made, she said, 'Thank God! that is over.' She asked me how I did—I said, 'Very well.' She said, 'I hope I did not fatigue you coming down stairs last night.' I answered, 'Oh, no!' and then she said, 'Thank God! that's over.' She said to me three times, after the first conversation with her about Alfred, and before the will was made, that if she lived long enough, she meant to do something for him, but life was very short. I thought she meant life was very uncertain." Mrs. Reeder testified that in April, 1849, Mrs. Moore informed her that she had given Alfred the money to build the house in Twenty-second street, "for him and his children when she would be in the grave." Mr. Phinney states that the decedent spoke to him several times about having given Alfred the means to build the house in Twenty-second street. "She said, she gave him the money because she liked him better than the other boys." Mr. Reeder says, "During the twelve months preceding Mr. Moore's death, I heard her say several times, she would make Alfred a handsome present." In the fall of 1849, when he called at the residence in Twenty-second street, Alfred Moore showed him the house, and the old lady asked Mr. Reeder what he thought of it. He adds, "I said it was a very nice house; and she said, 'I gave my son Alfred this house.' I replied, 'That's the present, then;' and she laughed and

said, 'That's the present.'" It thus appears that the will accords with the dispositions, affections, and intentions of the testatrix at other times expressed,—that she had previously designed some special provision for her son,—well understood and knew what she was about when she executed the will, and suggested a question as to the effect of the instrument in case she made the advance before her decease, —that she subsequently spoke of the testamentary act as if relieved that it was off her mind, and at several periods afterwards mentioned to friends that she had given the means for building the house. The evidence of capacity, volition and intelligence seems to me sufficient, after the most careful consideration I have been able to give the case ; and I must therefore declare the will duly proved.