NEW YORK COUNTY—HON. GIDEON J. TUCKER, SURROGATE—February, 1863.

## JULKE *v.* ADAM.

*In the Matter of the Probate of the Will of* JOHN ADAM.

Greater reliance is to be placed upon the testimony of an impartial and respectable lawyer, in regard to the due execution of a legal instrument, than upon that of a non-professional witness.

Evidence of habits of intemperance, and occasional fits of wildness, though

indicating an impaired mind,—*Held*, not sufficient to. establish a total and permanent want of testamentary capacity.

The testator was aged, and his mental capacity greatly impaired by habitual intemperance. In the presence of his wife, he directed that his will, drawn according to former instructions, should be changed; "that he wanted to satisfy his wife, and it must be drawn as she desired it." The wife then gave directions as to the particular disposition of property, especially that two-thirds, instead of one-half, should go to her. It appeared that the wife had for some time directed the intentions and controlled the acts of the testator.

*Held*, that probate must be denied.

Declarations of a wife tending to show an existing intent and disposition to unduly influence her husband in procuring the execution of his will,—*Held*, admissible.

*Delafield* v. *Parish*, approved and followed.

The testator died in New York city, the 12th of June, 1862. His widow, Louisa Adam, propounded for probate, as the last will and testament of the decedent, a paper, bearing date June 24, 1859, and witnessed by John A. Stemmler and Lorenz Sebastian.

Its probate was contested on the grounds of informality in the execution ; of mental incapacity of the testator ; and of undue influence exercised by his wife, the proponent.

DAVID LEVY *and* HORATIO N. WALKER, *for Proponent.*

N. SIEGRIST, *for Contestants.*

THE SURROGATE.—The testimony of the witness, John A. Stemmler, sufficiently establishes the observance of the necessary legal formalities. The will was read to the testator, paragraph by paragraph, first in English, and then translated by Mr. Stemmler into German (the native tongue of both) ; was then signed, sealed, published and declared in presence of the witnesses ; and they signed their names at his request, in his presence and in that of each other. The document was then inclosed in an envelope by Mr. Stemmler, and taken away from Mr. Stemmler's office (where the execution was) by the testator himself; he intimating that its tenor should not be made public. The witness Sebastian recollects some of these circumstances only, and is positive that others

of them did not occur; but the highly respectable lawyer, who himself drew the will and superintended its execution, is positive as to all these facts, and his testimony is clear and certain, while that of Sebastain, in the points where it varies from Stemmler's, is contradictory and forgetful. Greater reliance is to be placed upon the testimony of impartial and respectable members of the legal profession with respect to the execution of a legal instrument, than upon that of non-professional witnesses, upon whose minds the absolute necessity of the formula of law is not distinctly impressed. (*Moore* v. *Moore*, 2 *Bradf.*, 266.)

I have therefore no doubt that the formal execution of this will was according to the laws of this State. My predecessor on this bench appears to have had that opinion, since, on the 3d of November last, and after the evidence of these two subscribing witnesses had alone been given, he denied a motion to reject it on the question of execution, and directed the examination to proceed as to capacity and influence.

These are questions of the utmost delicacy, and they are rendered still more difficult to decide, when accompanied, as in most cases, by a contradiction of testimony. This evidence has not been taken before me; it was closed before my entrance into office; and I have had no opportunity to see and hear the witnesses, and to observe the many circumstances which aid a judge before whom testimony is actually taken, to arrive at a conclusion on the facts of the case. I must consider the testimony as it stands written down, and decide upon it, or run the risk of doing even a greater injustice to the parties concerned by summoning them to commence their voluminous proofs anew.

Thus situated, I am of the opinion, after many careful and thorough reviews of the entire testimony, that the weight of evidence does not prove John Adam, in the month of June, 1859, to have been by himself absolutely incapable of doing a legal act. It is true that his habits of intemperance appear to have been fixed and fastened upon him: he was occasionally wild and violent from the effects of intoxicating drinks.

But it does not seem that he would have been incapable of making a devise of his estate by will, if left to himself, and to the exercise of his own will and preferences. His mind was undoubtedly impaired and weakened, and capacity may have been occasionally temporarily suspended; but capacity was not lost.

The questions of the formal execution, and of the competency of the testator, if free to act for himself, being thus settled, it remains to be considered, whether, in his condition of mind, with his habits and course of life, and his surroundings and relations with others, there was such an influence exercised over him that the will in question became, not his own will, but that of another person. I have been compelled to resolve this question in the affirmative, and shall deny probate upon this ground.

The testator was at his death sixty-six years of age. He was a German by birth, and had begun life in this country as a shoemaker, but " worked very little;" his first wife " made salves and cured sores, and saved the money." Subsequently he opened a lager-beer saloon, in attending to which his wife and daughter (the contestants) labored industriously. It was from the time of his first wife's death that he appears to have begun to be steadily intemperate, though there is evidence of his dissolute conduct earlier. It was on February 25, 1858, that his first wife died, aged sixty-six years. She fell dead in the bar-room. His conduct on that occasion shows him to have, been grossly intoxicated, or morally and intellectually perverted to a shocking degree. He exclaimed, " There lies the d——d w——e, and I've got to bury her now." There is nothing to show that this first Mrs. Adam was not, as her daughter describes her, " an honest, decent, hard-working woman." A few months afterwards, a man named Yunun calls upon one Louisa ——, then living as a servant in an emigrant boarding-house, at Union Hill, New Jersey, and tells her, "if she wanted a better place, to go to Adam's." Louisa goes at once to Adam's; engages herself to him as a servant at monthly wages; and herself swears

that when she was advised to go there by Yunun, he told her that if she went, Adam "would probably marry her." Adam made good this prediction by proposing marriage to Louisa, as she swears, the very first night she was in his house; she accepted, and in a fortnight after (in September, 1858) they were married by Rev. Dr. Wieezork, a Protestant German Evangelical clergyman. The new wife, who was under thirty years of age, and the daughter of the decedent, Mrs. Julke (the contestant of this will), at once, and very naturally, came to disagree; threats of violence were made; and Mrs. Julke left the house.

The will was made after this, and after Mr. and Mrs. Adam had been married ten months. The circumstances appear to be these. Mr. Siegrist, who lived in Adam's house, had drawn a will for Adam. Adam and his wife brought this will to Mr. Stemmler, saying to him they were not satisfied with it. "There was a general conversation, in which Mrs. Adam took part. She said the will was not drawn as they wanted it drawn." "Both seemed to be satisfied" with a memorandum of their joint instructions, which Adam gave Stemmler. "He did not say any more than she. She took a great interest in the conversation." The will being drawn, Mrs. Adam came down to Stemmler for it, and took it away.

The next interview was near Stemmler's house, in Seventy-first street. Adam and his wife came down there in a vehicle: she alighted, and called Stemmler out, Adam being too weak to leave the carriage. They both said then that this will (drawn according to the former instructions) was not as they wished it; "that not sufficient property was given to her." Stemmler asked how it should be changed, and Adam replied that "he wanted the will drawn as she desired it." She talked loudly and excitedly, whenever Stemmler saw her. She said "they were not satisfied with the will, and he then said he wanted to please and satisfy her, and that the will must be altered." She said, "We didn't want it so; we want it so and so," stating the particulars in which it was to be altered. The change which they directed was,

that two-thirds of his property, instead of one-half, should go to her, the witness thinks. The will propounded for probate gives her two-thirds.

The next interview was in Mr. Stemmler's office; the will was not yet ready, and they went away, being requested by Stemmler to bring down a witness at their next coming.

It was at the next visit that the will was executed. It was read over to Adam by Stemmler, in his own room; but in the outer office was Mrs. Adam. They came together and went away together. Stemmler says "Adam was more or less under the control of Mrs. Adam." "She had a great deal of power over him." "I am of the opinion that Mrs. Adam exerted an undue influence over the deceased."

Mr. Stemmler states the circumstances of the constant attendance of Mrs. Adam upon her husband, with some particularity. He, Stemmler, never saw Adam without the wife. He received no instructions concerning business from Adam, except when the wife was present, and taking part in giving them. The provisions of the will being discussed, Adam said "he wanted to satisfy her," and Mrs. Adam said she wanted it to be so and so. Upon all occasions she appears to have directed the intentions and controlled the acts of her aged and weak husband. At times she was violent and threatening. But this one prominent fact appears above all—that she never left him; and that the instructions given as to the will show it to be her will, and not his.

The direct influence and interference of Mrs. Adam thus appear at every stage of the preparation and execution of this document. It went into her possession, it seems, and she "kept it in the desk" till the death of her husband. She admits that "out of joke she had told Adam she had destroyed this will." Again, she says, "I told him that I intended to tear it up." "Adam did not ask me to destroy the will;" but it does not appear that he knew or cared whether it was in existence or not, during the two years of almost uninterrupted drunkenness which closed his life.

The testimony of Mr. Stemmler would have been quite

sufficient on the question of influence, but we find it corrob-
orated by that of other witnesses called in the case.   I leave
out what the widow and the daughter say ; also what the
clergyman thinks.   The latter never but once came into the
lager-beer saloon, and had no opportunity to judge.   But
Stadleberger heard her say " I'm boss," and swears she
" represented herself as boss," or head of the house ; he
shows Mrs. Adam's direct interference in and control of Mr.
Adam's other business affairs ; that she swore her husband
should not sign a lease to him, Stadleberger, and he was
compelled to sue Adam in consequence for a specific perform-
ance to obtain his lease.

Goetzel shows that Mrs. Adam did almost all of Adam's
every-day business, directed and managed it, while " he was
generally lying on the bed."   It was " she spoke to me about
the business ; he never made any remark, but shook his head."
She said, " I am boss of this house, and I will show him so."
Goetzel also swears that Adam, four or five weeks before his
death, told him to hand some money he had to Mr. Siegrist,
to " put in the bank, so that something be secured for my
daughter."   Goetzel was directed by Mrs. Adam to make
out a mortgage in lending money to Schneider, and other
legal papers, and did so.

This testimony, as to the language and declaration of the
person against whom undue influence is charged, was taken
subject to objection ; but I admit it all, as it is clearly com-
petent to show declarations of a person so situated, so far as
they tend to prove an existing intent and disposition.   (*Brush*
v. *Holland*, 3 *Bradf.*, 240.)

Our books are full of instances where probate of wills has
been denied from evidence of undue influence exercised by
children, creditors, attorneys, or trustees, upon the weaken-
ed mind of a testator ; but to the credit of society we may
remark, that the instances where the improper influence of a
wife over the disposing mind of her husband has been estab-
lished, are few in number.   Probably the recent and impor-

tant case of Henry Parish's will,* finally decided in the Court of Appeals, is the most prominent of these.

In that case, the maxim *qui se scripsit heredem* was mainly relied on by the learned bench, in arriving at the conclusion that the papers propounded as codicils did not make part of the last will of the deceased; and the circumstances, though not perfectly similar, resemble each other so much in that case and this, that I feel bound to hold the widow, the principal devisee under this will, to an equally rigid rule. In this case, as in that, the changes in the will were for the benefit of the widow from whom the instructions emanated, were drawn up by her procurement, and must be regarded as done, not by the testator, but by her. (1 *Curt. Eccl. R.*, 637; *Crispell* v. *Dubois*, 4 *Barb.*, 693; *Parke* v. *Platt*, 2 *Phill.*, 323.)

In the case of *Tunison* (4 *Bradf.*, 138), the proofs showed that the widow of the deceased was present at the execution of the will; and while he was dictating its terms, she interrupted him frequently. In one case she exclaimed, "Give it to me, and I will give it to them." But the surrogate held that there was nothing fatal in mere disconnected suggestions of this kind, as it was impossible to say to what part of the will they applied. In the present case there can be no doubt on that point. The changes made in Adam's testamentary dispositions were all for the benefit of the widow. The testator and his wife visited Mr. Stemmler, his lawyer, in company, in order to change his former disposition of his property so as to add to the share she should take after his death. It does not appear here, as in the Tunison case, "that the wishes of the decedent were unrestrained in their full gratification by the acts or inducements of his wife." He appears to have had no will of his own, and his property must be disposed of by the provisions of the law.

---

* *Delafield* v. *Parish, Ante,* 1.