## ESTATE OF THOS. J. HILL, DECEASED.
### [No. 4,382; decided February 27, 1886.]

Will—Undue Influence.—The Evidence in this contest of a will, examined and held insufficient to establish a charge of undue influence.

Will—Inebriety of Testator.—The Evidence in this will contest examined and held not to sustain a charge that the testator was so addicted to the excessive use of intoxicants as to deprive him of testamentary capacity.

Will—Unsoundness of Mind.—The Evidence in this will contest held insufficient to establish a charge of unsoundness of mind on the part of the testator.

Will—Insane Delusion.—A Belief based on evidence, however slight, is not delusion.

Will.—The Fact that a Guardian has been Appointed for a person because of his incompetency to manage his affairs is not conclusive of his incapacity to make a will.

The Words "Insane" and "Incompetent" defined and distinguished.

Contest of will.

Giles H. Gray, for proponent, J. M. Haven.

John R. Glascock, for contestant, Jno. Woolley.

H. L. Adams, also for contestant.

COFFEY, J. On the second day of July, 1885, James M. Haven, through his attorney, Giles H. Gray, Esq., filed in this court a petition setting forth that one Thomas J. Hill died on or about the twenty-fourth day of June, 1885, in this city and county, of which he was then a resident, leaving estate therein consisting of personal property of the probable value of $5,000 cash; that said Hill left a will, dated March 22, 1884, in possession of the petitioner, naming him, the said petitioner, executor, and Wm. H. Aiken, Thos. J. Conroy, Mary E. Connor, John Woolley, Mrs. John Woolley, and the children of Mr. and Mrs. Woolley, the Grand Army Cemetery Association and the Veteran Home Association, corporations, devisees or legatees; that John Connor and Maggie E. McCann were subscribing witnesses to said will; that the next of kin of said testator and heir at law is John Woolley, aged about fifty years, residing in Placer county, California, a son of a deceased sister of said testator; that at the time of the execution of said will, March 22, 1884, said testator was over the age of eighteen years, and aged sixty years or thereabouts, and was of sound and disposing mind, and not acting under duress, menace, fraud, or undue influence, and was in every respect competent by last will to dispose of all his estate; and that it was executed in the manner and form prescribed by the statute; and that the executor named consents to act. The petition of said Haven further avers: That said decedent Hill also left another will in the possession of one Mrs. Mary E. Connor, dated November 13, 1884, in which said Haven is named as executor, and Wm. H. Aiken, Mary E. Connor, John Wool-

ley, Maggie E. McCann, all adults; Eugene McCarty and
Annie Riley, minors, and "The Soldier's Home" of Cali-
fornia, a corporation, are named as devisees or legatees; that
the witnesses to said will are John E. Donnelly and Maurice
J. Burns, and that at the time said will was executed, No-
vember 13, 1884, said testator was of competent age and of
sound and disposing mind; and, in view of the premises,
petitioner prays the admission of both instruments to pro-
bate, and that letters issue to him as executor.

The application of said Haven is opposed by John Wool-
ley, who contests the probate of the wills above mentioned
upon the grounds (after alleging that he is the nephew
and next of kin and heir at law of decedent Hill), that the
said wills were not executed according to law, nor signed by
Hill nor by his direction, and were not his last will; that at
the time of their execution Hill was and for a long time
prior thereto had been of great age, blind, feeble, debilitated
and deranged, both in bodily and mental health, and in-
capacitated thereby from executing a will; that at the time
of the alleged signing said Hill was, and had been for a
long time prior thereto, habitually intemperate from the
constant and excessive use of intoxicating liquors, and was
thereby so mentally deranged as to be incapacitated from
making a will; that at the time of the alleged signing of
said wills said Hill was unlawfully influenced and coerced
by certain persons, beneficiaries named in said wills, who
took advantage of his weakness and his trust in them to
compel him to make such disposition of his property ac-
cording to their desires, and not his own; that in and prior
to the month of February, 1884, contestant Woolley had the
custody and care of the person of said deceased; that during
said time and prior thereto he enjoyed the confidence and
trust of said deceased; that in or about said month of Feb-
ruary, 1884, said deceased was removed from his care and
custody by the order of said Haven, who was then guardian
of the person and estate of said Hill, and consigned to the
care of Mary E. Connor (one of the beneficiaries named in
said will), where Hill remained until his decease in June,
1885, that after the removal of Hill to the care and custody
of said Mary E. Connor, the contestant made repeated ef-

forts to see him, but was repulsed, and in every instance refused permission to enter the house of said Mary E. Connor, where said Hill was kept; that said Haven and the others named as beneficiaries in said wills, with intent to deceive and to influence Hill to make said wills, prevented contestant from seeing said deceased, and excluded him from the society of Hill; that none of said persons named as beneficiaries is of kin to deceased, nor entitled to a distributive share of his estate; that all of them knew that at the time of the alleged signing of said wills Hill was, from the causes already specified, easily influenced by those by whom he was surrounded, and that so knowing they so wrought upon his bodily and mental weakness to influence, by false tales and accusations directed against said contestant, that he became causelessly embittered and angry with contestant, and was thus induced and influenced to make said wills; that a long time prior to the alleged signing of said will the superior court of San Francisco granted to said Haven letters of guardianship of the person and estate of said Hill, on the ground that said Hill was then and there an incompetent person; that at the time of said alleged signing of said wills and prior thereto said Haven was the legally appointed, qualified and acting guardian of said Hill, and continued to act as such to the time of Hill's decease; that Aiken, named as one of the beneficiaries in said wills, had acted as Hill's attorney, legal adviser and confidential friend in matters connected with the pension and arrearage thereof due said deceased from the government of the United States; and that the other persons aforementioned as beneficiaries were in more or less close and intimate relations with said deceased, and used every means to obtain his confidence up to the time of the said alleged execution of the said wills, and did so obtain his confidence, and that they knew his mind was weak anl easily influenced; and that they and each of them did perpetrate a fraud upon said deceased by inducing him to sign said paper; that they and each of them suggested to said deceased, prior to the time of said alleged signing, that contestant was an impostor, and was attending to and caring for said deceased for the purpose of getting his money and estate, that contestant was constantly rob-

bing deceased of his money, and other suggestions of like nature; which suggestions were false and fraudulent, and made with intent to deceive said deceased and had that effect, embittering his mind against contestant, and inducing him while in such frame of mind to sign said will.

The foregoing is the substance of both counts of the contest, to which answer was made by the proponents and by the legatees named in said will, denying specifically all the charges and averments of the said contest tending to establish its invalidity, and alleging that said will or wills were in all respects valid and entitled to admission to probate.

Thos. J. Hill, the testator, came to California as a soldier in the Stevenson Regiment in 1847, having enlisted in New York in the year preceding; in October, 1848, he was discharged, and went, in 1849, to the mines, being mainly engaged in Tuolumne county, where he took an active interest in public affairs, and was a candidate for sheriff of the county, without success, and the occupant of the post of deputy sheriff, and otherwise locally conspicuous; his career was marked by the vicissitudes common to the experience of early days in California, until, in 1861, he re-entered his country's service as a volunteer, and continued until the expiration of his term of enlistment. The exposure and hardship undergone by him during a portion of this period, while stationed in Arizona, resulted in an impairment of his vision which compelled him to enter the County Hospital, and ultimately his entire loss of sight and transfer to the almshouse. Upon being awarded a pension by the government, sufficient to enable him to live comfortably, according to his station, he left the Almshouse and came to the city.

Here he lodged at different places, having hired attendants, until his nephew, John Woolley, the contestant, was sent for to the country and came to care for him in May, 1883, remaining until February, 1884, when he left, according to his own testimony, because the service was too confining and he couldn't get along with the boy, Thos. J. Conroy, whom Hill had hired about three years before, and who was and had been for nearly all that time the personal attendant of the blind man, who had acquired an attachment for the boy, in

spite of certain censurable traits in the latter's character. The pension was procured through the agency of W. H. Aiken, an attorney at law employed by Hill for that purpose, who began his acquaintance with Hill in 1869, when the latter visited him at his office to secure his services in that behalf, and from that time on they continued intimate, and when, the pension being obtained, Hill came out of the Alms-house, it was Aiken who selected a room for him and visited him frequently, and obtained from time to time financial favors from him, and seems to have been his main adviser until, on account of the transaction between Hill and Pension Agent Cox, which came to a head in 1882, the decedent was placed under guardianship. That transaction, with which Aiken testifies he had nothing to do, consisted in Hill's allow-ing Cox to invest $5,000 of his pension moneys in a mortgage on a mill that burned down, and a mine that "petered out"; which conduct of Cox coming to the notice of the govern-ment, a special agent of the treasury, a Mr. Magan, was sent out to investigate, and, as a consequence, a restitution of the amount was made by Cox to Hill. Thereafter, in January, 1883, the special agent Magan introduced to Hill the proponent, James M. Haven; this was at a house on Vallejo street, where Hill was in charge of Conroy and a Mrs Clark, a house attendant. January 29, 1883, the petition of said Magan was filed, asking, for the reasons that Hill being upward of sixty years of age, totally blind and in feeble health, and by reason of extreme old age and of recent sick-ness which had impaired his mind, being mentally incompetent to manage his property, that a guardian of his person and estate be appointed, and praying that said Haven be ap-pointed. On the 5th of February the court found that said Hill had estate that needed care, and "that said Thomas J. Hill, by reason of blindness, old age and physical infirmity, is incompetent to manage his business or take charge of his estate," and ordered that Haven be appointed guardian, and that letters issue upon filing a proper bond. From that time Haven took charge of Hill as guardian, and directed his affairs until the death of the ward; visiting him frequently at his various places of residence, counseling him, and seeing

to the service of attendants. During this period Conroy, and after him one Adams, waited on Hill until Woolley came as stated, and Woolley had principal personal charge until February, 1884. Woolley went to the office of the guardian, Haven, and said he couldn't remain longer with Hill because of the latter's abuse; and immediately Haven caused Hill to be removed to the house of Mrs. Mary E. Connor, whither Hill was content to go. There, it is said, he improved greatly in condition, and at that house he executed the will of March 22, 1884, and of November 13, 1884, which instruments are here under contest.

The first question to be considered is the effect of the existence of the letters of guardianship upon the capacity of Hill to make a will.

Counsel for contestant contends that the testator, having been declared mentally incompetent, he could not execute a will until his restoration to capacity, and that such restoration must be determined in the same manner as his incapacity, according to section 40 of the Civil Code, which reads:

"Section 40. After his incapacity has been judicially determined, a person of unsound mind can make no conveyance or other contract, or waive any right, until his restoration to capacity. But a certificate from the medical superintendent or resident physician of the insane asylum, to which such person may have been committed, showing that such person had been discharged therefrom, cured and restored to reason, shall establish the presumption of legal capacity in such person from the time of such discharge."

The section as here quoted was adopted in 1878, and was an amendment of the statute which theretofore read as follows:

"Section 40. After his incapcity has been judicially determined, a person of unsound mind can make no conveyance or other contract, nor delegate any power, nor waive any right, until his restoration to capacity is judicially determined. But if actually restored to capacity he may make a will, though his restoration is not thus determined."

Counsel for contestant claims that the section as amended in 1878, and as it has continued since, is a conclusive bar to testator's act, until he shall be restored to capacity by judicial decree. But the section of the Civil Code speaks of "a person of unsound mind," and would seem to refer to those persons whose minds are so deranged as to necessitate committal to an asylum for the insane, and even in such case it is not at all clear that "restoration to capacity" means a judicial ascertainment and declaration to that effect. If it were intended to have such meaning, one word only was necessary to place it beyond doubt; the legislator could easily have employed the epithet "judicial," qualifying "restoration to capacity"; instead of which he has amended by striking out the clause "is judicially determined" after those words, leaving it to be implied, if it be not explicit and in no need of implication, that actual restoration to capacity is the true intent of the section.

But it is not clear to my mind that "insane" and "incompetent" are, as counsel for contestant contends, convertible terms. A person may be incompetent by reason of insanity, or from some other cause incapable of caring for his property—the statute speaks of the "insane or incompetent" person (Code of Civil Procedure, section 1763); it speaks further (section 1766) of the proceeding for judicial restoration to capacity before the court of the county in which the person "was declared insane"; it requires notice to be given to the guardian and relatives of "the person so declared insane or incompetent." From a consideration of the whole of the statute, I am of opinion that there is a distinction and a difference between "insane" and "incompetent," and that they are not, in the sense of the statute, convertible terms. Now, what did the court declare in the proceedings to adjudge Hill incompetent? Was he declared insane? It seems not; for the finding of the court is in these words: "That said Thomas J. Hill, by reason of blindness, old age and physical infirmity, is incompetent to manage his business or take charge of his estate."

Upon the finding, the result of the "full hearing and examination" (Code of Civil Procedure, section 1764), by

the court, Haven was appointed the guardian of Hill. Now, I apprehend that, in judging of the effect upon Hill's testamentary capacity of the guardianship proceedings, this court must have resource to the decree or "declaration of incompetency" and be bound by its terms; and the whole of that decree or declaration, as hereinabove quoted, contains no item importing insanity. I have given to this question the greater consideration, because the full and forcible presentation of the views of counsel for contestant impressed me strongly at the hearing, and I have felt in duty bound to examine carefully the grounds of his judgment, as stated in argument; but after examination I am constrained to differ from him. I do not think that the guardianship proceedings which resulted in the order of February 5, 1883, took away the testamentary capacity of Thomas J. Hill, or that it is "a conclusive bar" to this proceeding. It is proper, therefore, to consider the evidence as to the sanity of the testator at the times of the execution of the instruments propounded for probate.

Was Thomas J. Hill, the testator, of sound mind on March 22, 1884, and November 13, 1884, or on either of those occasions, when the papers offered for probate were signed? Civ. Code, sec. 1270.

Contestant alleges that at those times decedent was of great age, blind, feeble, debilitated and deranged in bodily and mental health, and thereby incapacitated from executing a will; and that also at said times decedent was intemperate from constant use of intoxicating liquors, and thereby so mentally deranged as to be incapacitated from making a will.

In support of these allegations contestant, after producing the documents to assail their validity, introduced James M. Haven, who testified that Hill died June 24, 1885—Haven is the proponent—Maggie E. McCann, a subscribing witness to the first will, who identified the instrument and narrated the circumstances under which she signed as a witness. She testified that Hill was blind; that he said to her, "Margaret, sign this," and that at the time he was of sound mind and acting of his own will and declared it to be his will, etc. John E. Donnelly, a subscribing witness to the will of November

13, 1884, testified that he knew Hill, and that he signed the paper at 224 Eleventh street, San Francisco, at Hill's request, in his presence and in the presence of the other witness, Maurice J. Burns, Hill declaring the paper to be his last will and testament. Witness Donnelly drew this last will, and every word of it was dictated by Hill; witnesses Donnelly and Burns were inmates of the same house where Hill was residing, and had known him in that way for some months prior to this occasion. Donnelly further testifies that Hill dictated the outlines of the will and he wrote it. Hill said, "Give to so and so," and then the scribe filled it out; the testator said to Burns, the other witness, "Maurice, sign this." The will was read to Hill by witness; Hill made his mark + to the paper, and one Charles H. Middleton wrote his name as witness to the mark. The testator was very particular about his will, so testifies Donnelly. After the testimony of Donnelly contestant offered in evidence the papers in the guardianship matter, to show that the testator was of unsound mind at the time of signing the wills; and then called Eleanor White, who testified that she knew Hill, who rented apartments of her at 1141 Folsom street, where Mr. Woolley was his nurse, to whom he was very friendly. This began in June, 1883; Hill was intemperate in his habits; he drank to excess; his mind was very weak; she saw him once or twice a week for the first two months, and not so often the last month; saw him an hour or two at a time; herself and husband frequently called upon Hill; in her opinion Hill was not of sound mind; her reason for this opinion was what she saw of him and his conduct; his nephew, the contestant, was with him all the time, and was very kind to him; Hill appeared to her at all times like a man who was under the influence of liquor; Conroy was Hill's attendant during this time; witness never had seen an insane person, and her opinion of Hill's unsoundness was based upon his habits of drinking and his changeable views.

The next witness was Dr. N. P. Foster, a physician whom Woolley took to see Hill in November, 1883, and he found Hill suffering from alcoholic poisoning. The witness defined the different phases of alcoholism; Hill was delirious; wholly

oblivious to everything; not conscious of any of his surroundings; taking his condition altogether, he might be the victim of chronic alcoholism; he was in an advanced stage of alcoholism; the witness judged from his observation of Hill that he had been a hard drinker for years; chronic alcoholism impairs the mind and gradually leads to general imbecility.

Dr. Foster further testified that he saw Mr. Hill at 106 Langton street; he was there about half an hour; Hill's condition couldn't have been brought about by a single debauch; the room was comfortably furnished, and Hill was cleanly clad. Woolley was sober enough to know what he was about, although the witness paid no particular attention to him, as Woolley was not his patient.

Thomas J. Conroy, the attendant of Hill, testified that he first went to work for him in 1881; left him three or four times; worked for him over three years off and on, took charge of his room, led him around wherever he wanted to go; never heard any of the Connor family talking to him about anybody; Hill called Mrs. Connor "mother," she called him "papa," and the children called him "Papa Hill"; the children were up there nearly all the time. Eugene McCarthy waited on Hill a good deal. Eugene is a beneficiary in one of the wills, as is Conroy in the first will. Conroy testifies that Hill was not a firm man, very changeable in mind; he would never have his right mind talking; he said he would never have Woolley come near the house; this was said in presence of the Connors; Hill drank very much; if liquor was not given to him he would jump up and get mad, curse and swear, and say, "if he couldn't have liquor he might as well die"; he would rather drink whisky than eat. Mr. Aiken would come and borrow money sometimes, and he would stay half an hour talking; witness was present sometimes during their conversations. Aiken had an influence over him; everything Aiken would tell him to do he would do; Hill was easily influenced by those around him. Witness is a few months over eighteen years of age; witness was present at the time Mr. Haven drew the will of March, 1884, in which he (witness) is a legatee for $500; Hill sent for Haven to make out a new will; witness couldn't remember the con-

versation; Haven was there half or three-quarters of an hour. Hill was very firm in insisting on his whisky; he was strong on that subject, and he was very stubborn on the question of refusing admission to the Woolleys; witness read the paper to Hill every morning, and got books from the library; Hill used to talk politics with persons sometimes; he also planned to go out on Decoration Day, and we went out; he used to know when witness went out and when he came in; still, witness thought there was no great intelligence about him; he could recognize a man by his voice, not by his step.

John Bush, another witness, was the landlord of the place 1305½ Vallejo street, which was occupied for a while by the deceased; witness saw Hill occasionally, used to visit him to keep his spirits up when he had no society; Hill was blind, paralyzed a little on the right side, a little lame in the arm; he had a nurse, a lady, and a boy to attend him; Hill was so fickle-minded that witness didn't think he knew his own mind; Hill used to say, "They are robbing me entirely"; he said Haven, his guardian, threatened to take his pension away; in witness' opinion Hill could be led by those about him; Mr. Aiken rented the place from me for Hill; witness saw Aiken there on several occasions. Hill said that Aiken charged him $750 for the furniture in the "flat," which, in witness' opinion, was worth no more than $150; Hill said that if he didn't do as Haven told him the latter would stop his pension and put him back in the Almshouse; witness took a drink occasionally with Hill; at one time Hill got a Mr. McManus to see a lawyer to change his guardianship, but Hill changed his mind, and the man said: "Hill, I want no more to do with you; you're a fickle-minded man and don't know your own mind."

Sarah Clark testified that she was nurse for Hill for nine months, and kept house for him; saw him every day; he was in the habit of drinking every day; deprived of his dram he became very ugly; he always spoke well of Aiken and Haven; he had no confidence in anybody but Aiken; wanted Aiken to come every day; if he wanted to buy anything in the shape of dry goods he wanted Aiken to make the purchase; he told her on one occasion that Haven said that if

he didn't do as he (Haven) wanted him to do, he would put him in a private asylum; Hill told witness that he gave Aiken $1,000 for procuring his pension; when special agent Magan visited Hill, the latter told him that Pension Agent Cox had $5,000 and Aiken $1,000, and he spent money for furniture; that Cox had invested in a mining mill at four per cent. or something, and he thought Aiken earned his thousand dollars. Magan introduced Haven to Hill. Hill seemed to know what was going on; he knew the voices of persons but not their step; he said he had no relations; he drank a great deal, whisky every fifteen or twenty minutes; we always put water in it; once he had delirium tremens; Conroy, the boy attendant, used to give him whisky; couldn't help it, because he would get ugly for it; Conroy used to treat Hill cruelly, would provoke him; sometimes the boy would go away and stay the whole night; this would make the old man wild, but he would easily forgive him, as he liked the boy very much. Tommy (Conroy) used to carry the money; during the time of Mr. Magan he didn't drink so much, perhaps five cents worth of beer a day, for say two months, January and February, 1883; witness left him in May, 1883.

Dr. James D. Whitney, physician and surgeon, of over twenty years' practice here, visited Hill once when the latter had broken his arm, but another doctor nearer by was called and there was no occasion for witness; this was in Vallejo street; Hill was in a very nervous condition and required anodynes; witness was afraid he would go into delirium tremens; he was evidently suffering from alcoholism; couldn't say, except from information, whether he was in a primary or advanced stage; assuming he was suffering from alcoholism and partial paralysis, witness should say he was of unsound mind; if his mind was not too much affected before, a change to comfortable conditions would tend to restore him to a normal state.

Patrick Lynch, a resident of San Francisco off and on since 1847, testified that he knew Hill from 1846, when he first saw him on Governor's Island, New York, then afterward in 1847 at the Presidio; after that saw him on Guerrero street during the year 1883, called there frequently to see him; had

conversation with him; would not think he was insane but wouldn't put him up for a man of strong mind; witness' opinion was that Hill was a man of changeable mind; didn't think he was in his right, sound mind at any time he visited him on Guerrero street, when Woolley had charge of him, say in 1882; Woolley's treatment of Hill was kind, food good, rooms clean; their relations very friendly; Hill spoke kindly of Woolley, called him "nephew," and Woolley called him "Uncle Tom." Witness was a subscribing witness to a revocation of a will, together with Woolley; the revocation was drawn by John Quincy Adams and was signed by Hill on Guerrero street; had conversations with Hill about his blindness; he told witness it was caused by neuralgia, and heat and exposure in Arizona; saw James Adams and others on Guerrero street; Adams had been acting as nurse; there were four rooms in the house which they occupied; house well kept, and Hill's personal condition neat and cleanly; Hill was generally intelligent in conversation; he and witness would talk over the topics of the day and over old times when they were soldiers together; from 1849 to 1873 or 1874 witness lost sight of Hill; once Hill was angry because he wanted to set up Woolley in business and let him have $2,500 or $3,000, and Haven wouldn't allow it; witness didn't advise one way or other, but simply said he thought it might be a good thing.

James Hill knew deceased in 1883; they were neighbors in 1141 Folsom street; they were veterans of the war, witness of 1861-65, deceased of the Mexican War; witness knew of no particular delusion, except when Hill was in liquor.

John Woolley, contestant, testified that deceased was witness' mother's brother; first met him on Guerrero street; he had sent a letter inquiring for witness, who didn't care to stay with him, as witness had a family in Placer county; witness took charge of him May 11, 1883, and left him in February, 1884; their relations were good; witness treated him as kindly as if he were a child, and the feeling was kind in return, until Hill's mind was poisoned against witness; witness gave Mr. Haven as a reason for leaving Hill that the life was too wearing for him and he was too closely confined; witness didn't know who poisoned Hill's mind against him,

but he thought so from Hill's changes; he cursed him and
his wife; witness didn't receive any particular compensation;
witness went there from love, because Hill was his mother's
brother; Hill offered him twenty dollars per month; witness
told Hill he couldn't take any such sum, but witness did draw
some; the day witness left he had a conversation with Hill
in Haven's presence, when witness asked Hill for some money,
and Hill answered that he didn't owe him "a d——d cent";
witness told his uncle he thought that was pretty hard after
his kind treatment of him, and Hill said witness treated him
well; witness was housekeeper and nurse, and did the cook-
ing.  There was also introduced in evidence by contestant
a paper purporting to be a will of Hill, dated August 20,
1882, to show that a large number of persons named as bene-
ficiaries were relatives of Aiken, named therein as executor;
this paper came from the possession of James M. Haven, who
proceeded to explain certain pencil marks and memoranda on
the margins of the paper, made and used in the drawing of
another will by Haven for Hill; this document was called the
"Blood," or "Aiken," or "Blood-Aiken" will to distinguish
it from the others.

I think the foregoing is a fair short statement of the sub-
stance of the testimony for contestant and plaintiff herein.

For the proponent and defendant Donnelly testified as be-
fore substantially, and also that Hill was a very neat and
tidy man, of cleanly habits, intelligent and well posted in
affairs, could hold his own in argument; fond of music, de-
lighted with witness' banjo playing; witness is an actor and
variety performer; witness was of opinion that Hill was per-
fectly sane at time of making the wills of March 22 and No-
vember 13, 1884; judged so from his conversation and con-
duct and manner; he was logical and clear in argument.
Maurice J. Burns, the other subscribing witness to will of No-
vember 13, 1884, corroborated witness preceding.  Both these
witnesses were friends of the Connor household.

Edward Barthrop came to California in same regiment with
Hill, knew him continuously thereafter until 1849; were min-
ing partners in Tuolumne and other mines; afterward wit-
ness met Hill at the beginning of the war of 1861-65, in which

they both served in different branches of the Union Army; next saw him in Guerrero street; had a conversation with him of about an hour's length at that time; he was perfectly sane in mind; witness' reason for this opinion was that he could discern no difference between Hill then and when he had seen him before, except that physically he was blind and paralyzed; saw him again on Guerrero street; paid a third visit and he had moved to Langton street, where he was not as comfortably situated; Woolley was attending to him there; James Adams was his attendant on Guerrero street; had conversed with him on Langton street for about twenty minutes; he was of sound mind; next saw him on Eleventh street at Mrs. Connor's; his condition as compared with what it was on Langton street was materially improved in his surroundings, and as to his manner and his cheerfulness; called there about twice in November, 1884, about two or three times a week witness called there; had one conversation of three hours' duration; Hill said he was contented; his memory was good, he set witness right as to dates, had a retentive memory; he was sane in mind; witness never had any reason to doubt it; Hill said to witness that he was glad to get rid of Woolley; that if he had stayed there with Woolley he would have died, if he had remained on Langton street, whence Haven had removed him; Hill told witness he had been left alone in the house at night, and that his money had not been properly accounted for; Hill said he was satisfied with his guardian and was contented; witness disclaimed any knowledge of the terms of the will, or intimacy with the parties.

Frederick L. Post first met Hill in New York in 1846, at the headquarters of Company A, Stevenson's Regiment, where Hill was mustered in as a drummer, witness was orderly sergeant; in October, 1848, the regiment disbanded; next saw deceased in 1861, and again in 1874 or 1875; after that he went to Almshouse; in 1878 he was brought in to get his pension, and Colonel Stevenson and witness identified him; in 1882 witness had a Thanksgiving dinner with Hill; their conversations were usually about the old regiment, its survivors, and like topics; Hill desired witness to make inquiries about his relatives, as he desired to leave them what he had; at his

instance I wrote to Wm. Woolley, his sister's husband, at Campo Seco, who was a member of their old company; next saw Hill on Guerrero street; his nephew had charge of him; witness used to stay there an hour or two at a time; once Wm. Woolley was there on a visit; on Decoration Day of 1883 witness accompanied Hill in a carriage to Odd Fellows' Cemetery, was with him three or four hours that day, the best part of the day; witness next saw him on Langton street; he seemed to feel uncomfortable; whisky was the trouble; saw him again when he removed to Eleventh street, in 1885, and in June 1884, was there two or three hours. The witness said that Hill complained of Woolley in some particulars; Hill seemed to think Woolley's family were too great a tax upon his resources; Hill was well treated at the house of Mrs. Connor, but he had too much whisky; this was true at all times; on Thanksgiving Day, 1882, when witness was at dinner with him, Hill was mentally sane; witness said he could not but be struck with Hill's extraordinary memory; was struck with its retentive power, especially with regard to the details in obtaining his pension from the agent; his memory was strong in accounting for those whom he had known, or in recounting the scenes through which he and witness had passed; this was while Hill was at Mrs. Connor's house; witness used to visit there on Sundays; Hill was generally clear and lucid; sometimes witness said (in answer to counsel for contestant) he didn't think he was of sound mind; he was weak and vacillating, except upon the question of drink, and upon that point he was very positive; witness thought that persons who constantly plied him with liquor could do anything they pleased with him; when witness was at Mrs. Connor's, Hill was supplied with liquor upon his demand; not more than two or three times upon any occasion; he was subject to vagaries; the one who was nearest to him and humored him most could do almost anything with him; witness thought Hill had more liquor at Vallejo street than elsewhere; when he was under care of Mrs. Clark and the boy Conroy; on Folsom street Hill talked as if he was ill-used; witness saw him there only once; he seemed aggrieved about Conroy's conduct; witness thinks Hill was unduly influenced by the Connor family; there was

too much cajolery, in the opinion of witness, more than could be paid for by so much a month; Hill was very well taken care of; there was so much done to make him happy, there seemed to be something behind that witness couldn't explain exactly.

Miss Mary E. Morrison, a school teacher, an intimate friend and frequent visitant at the home of Mrs. Connor, saw Hill often while there; never saw him under the influence of liquor; thought he was mentally sane, because he talked to her so lucidly; he discussed political issues and seemed well informed; Hill improved very greatly in the Connor house; when he first came he was not so cheerful as he afterward became; he grew stout; he told witness that at one time he wanted to put a pistol to his head and Woolley put one in his hand, and Master Conroy corroborated this statement.

Mrs. Ann Hennings, another intimate friend of the Connor household, testified to same effect as to sanity of Hill.

Chas. H. Middleton, as to will of November 13, 1884, testified that he witnessed the mark, and Hill was mentally sane at the time; witness lived in the same house, and saw much of Hill and conversed with the old man; for the last five weeks of Hill's life witness was with him night and day, except two nights, when witness was relieved.

Dr. M. A. Cachot visited Hill for the first time on May 20, 1885, made in all thirteen or fourteen visits; the patient always answered promptly and to the point all questions; witness never saw any sign of insanity in him; he was sane; witness was family physician of the Connors, is a graduate of college, at one time in charge of St. Mary's Hospital; Hill was not suffering from alcoholism when witness saw him; bore no symptoms of alcoholism.

Dr. S. R. Gerry, a thirty-six years' practitioner in San Francisco, a physician since 1839, knew Hill in the Almshouse, of which institution witness is and was resident physician; Hill had amaurosis, paralysis of the optic nerve; otherwise he was in good corporal condition; had frequent conversations with him, reminiscences of Mexican War and topics like that; afterward witness visited Hill on Chestnut street about twice, two or three years ago; in the Almshouse pre-

scribed occasionally a little whisky and brandy for him, not regularly or continuously; Hill was in the Almshouse ten or twelve years; he was bright and intelligent, mentally sane at all those times; witness based his opinion on the general tenor of Hill's conversation; he was a very tractable patient, easily governed, but he had a strong will of his own, as witness judged from his positive manner; witness didn't think that he was easily influenced.

Dr. L. L. Dorr, a physician and surgeon, first met Hill before the pension board, of which witness was a member, in 1880; afterward in 1882 for a half hour, perhaps, treated Hill for some ailment of the bowels; conversed with him on his physical condition, about his blindness; this was July 18, 1882; he was perfectly sane; if he were not sane in the examination before the pension board, witness would so report. Witness said a person suffering from chronic alcoholism might be competent to make a will.

Miss Maggie E. McCann repeated substantially her testimony as to execution of will of March 22, 1884; she knew Hill all the time he was at her mother's house, of which witness was an inmate; conversed with him frequently; he spoke of Mr. Woolley, said he tried to beat him once on Langton street, and Conroy saved him, and that was the reason he liked the boy; at the time of the execution of the will of March 22, 1884, Hill asked Haven if he would accept anything, and Haven said: "I don't wish any of your money; don't need it." On November 13, 1884, Hill was sane in witness' opinion.

Dr. Julian Perrault, physician and surgeon in San Francisco since 1859, saw Hill September 25, 1882; treated him for quite a severe injury to the arm; thought Hill had been drinking too much; Hill was rather an intelligent old man, and witness sometimes chatted with him when time permitted; never saw him intoxicated; he was an old soldier, and witness thought his condition required stimulants, and witness allowed him a certain quantity of whisky; Hill was a man of strong will and good understanding; there was nothing about him to indicate chronic alcoholism when witness saw him; the quantity of liquor witness prescribed would be

about two gallons a month; the first night witness saw Hill he was suffering from acute alcoholism—that is, the result of one debauch; whether three gallons a month would be too much liquor would depend on a man's physical organization; some men can stand that much without injury.

James H. Adams knew Hill in 1846, a fellow-soldier; had the care of Hill on Guerrero street and on Vallejo street; he was correct in his habits; after Woolley came the quantity of whisky was greatly increased; Woolley drank and others, outsiders; Hill was very generous and liked to treat his friends well; he was never intoxicated before Woolley came; never under the influence of liquor; afterward witness saw Hill intoxicated, sometimes very far gone; always considered Hill perfectly sane; he was as clear and level-headed as any man witness ever had to do with; witness was with Hill six weeks; four weeks before Woolley came, and two weeks after that event.

Wm. Kane worked for Hill two days and a night, and lived hard-by Hill on Langton street for about two months; went there after Woolley left; Hill wasn't very clean; clothes old and shabby; no shoes on; wore slippers when we took him to Mrs. Connor's; Hill was afraid of Woolley's coming back; witness remained to protect him as much as anything else; Hill told witness to throw Woolley out if he came back.

Eugene McCarthy took care of Hill from May 1, 1884, until his decease; attended on him, gave him a tablespoonful of whisky when he wanted it; used to read to him and wait on him; witness has been at Mrs. Connor's about three years; Hill paid him same as Conroy, fifteen dollars per month; saw Hill intoxicated three times—Decoration Day, his birthday, and Fourth of July.

W. H. Aiken testified as to his relations with Hill, and gave his opinion that he was sane at all times, remarkable memory, and acute hearing and sensible conversation were characteristics of Hill; he could tell a person by his step; was very bright and intelligent.

John Hogan, a resident in the Connor house, testified substantially the same as other inmates therein, who saw Hill frequently and conversed with him.

Mrs. Mary E. Connor testified that she was the person mentioned by that name in the instruments propounded; she became acquainted with Hill on Langton street; called there with the sister of Conroy to see Hill; Mr. Woolley was there and said he was going to leave; Hill complained of Woolley; said he could drink more than himself; could take beer three or four times a day, and whisky in the morning; Hill was neat and intelligent; had taste for reading, and liked persons to read for him newspapers and books; liked music greatly; was perfectly sane; he didn't want to see Woolley; didn't want him in the house; didn't think it right that Woolley brought his family to live on him, and to make him support them; she felt friendly toward Woolley.

James M. Haven testified that he was the executor named in instrument dated March 22, 1884; Hill told him he was never married; witness became acquainted with Hill in January, 1883; was introduced by special treasury agent Magan, in Vallejo street, when Conroy and Mrs. Clark had charge of Hill; after the Woolley family came, Hill complained of the circumstances, and of what Woolley's wife once said when Hill spoke of the noise made by the children; Mrs. Woolley said she wished "his old carcass was at the bottom of the bay"; once when witness was present Woolley and Hill had very rough talk; Woolley said he couldn't stay with Hill, nor could anybody else; afterward Woolley came to witness' office and said he couldn't stay longer with Hill, because Hill abused him, called him vile names and so on; the next day after Woolley left, Hill was removed to Mrs. Connor's house; witness selected the place and caused the removal, and Hill was content to go there; after that he improved very greatly; witness was with him when he died; saw him for two hours and a half before; on March 22, 1884, Hill was perfectly sane; as to the instrument called the "Blood" or "Aiken" will, witness made the pencil marks at the direction of Hill, when he was giving witness instructions for drawing the will of March 22, 1884; on November 13, 1884, Hill was sane; he acted at all times like a sane man; his conversation was intelligent; there were times when Hill was under the influence of liquor when his mind was not

sound; Hill told witness that Woolley wanted him to revoke the "Blood-Aiken" will. Hill told witness to give Woolley, his wife and children $1 each; witness suggested larger sums for the wife and children, saying he didn't think they should suffer for Woolley's wrongdoing, but Hill said, "No, I'll give them but a dollar apiece." Hill was not a man easily susceptible to influence; it was very hard to influence him; witness never said that if Hill didn't do as he wished, he would put him in a lunatic asylum; but did insist on Hill's leaving Vallejo street, and getting into a better locality.

H. J. Stafford, a justice of the peace of San Francisco, and an attorney at law, knew Hill; met him two or three times before last election (1884); had conversation with him on general topics; upon politics so far as it was safe for witness to venture; Hill was very radical in his views, and witness, being of opposite opinions, didn't think it prudent to pursue such discussions; Hill was sane; there was nothing about him to indicate insanity, and witness never had a suspicion of Hill's sanity; he was a man of very strong convictions and wanted to argue; ready for argument; clear and logical in his processes of reasoning.

The foregoing is a fair view of the substance of the testimony on both sides.

So far as the execution of the documents propounded are concerned, they are both executed in all particulars conformably to the statute: Civ. Code, secs. 1276, 1278.

The case of the contestant with respect to the soundness of mind of the testator is not established; the great preponderance of evidence being that he was at all times—when not under the influence of liquor—intelligent, clear and strong in mental faculties, with a retentive memory and a positive will; the physicians particularly are upon this point plain-spoken. Doctors Cachot, Perrault, Gerry and Dorr saw much of him, and speak with precision and emphasis; Doctors Foster and Whitney each but once, and under circumstances not so favorable as the others for absolute judgment. All these gentlemen are in good professional standing, and entitled to credence and respect; but the conditions under which the two last named saw their patient differ from the

others to such an extent as to render their testimony much less valuable; and their testimony as experts is entitled to no greater consideration than that of the other physicians who oppose their opinions. I do not think any other conclusion can fairly be drawn from the evidence than that Thomas J. Hill was a man of sound mind. Even if at times vacillating and vagarious, as the witness Lynch and Post in substance said, and other witnesses on the same point corroborated, the general tenor of their testimony supports the theory of sanity; Barthrop, James Hill, James H. Adams and John Hogan are clear upon this question, and they saw the decedent frequently during his latter years; two of them —Barthrop and Adams—being his comrades in the Mexican War; in addition is the evidence of Miss Morrison and Mrs. Hennings, which is assailed as interested; but the nature of their interest is not such as to discredit them; that they are "friends of the family" is not of itself sufficient to justify a judge or jury in rejecting their testimony. I do not deem it necessary to advert further to the testimony upon this point, an abstract of which I have endeavored to make in the preceding pages; nor is it necessary to quote here long definitions of soundness or sanity of mind, in order to show how far short contestant's proofs fall in establishing his allegation. I shall only cite: Estate of Black, Myr. 27, 28; 1 Redfield on Wills, 59, 60 et seq.; 1 Jarman on Wills, 103; Estate of Crittenden, Myr. 51; 1 Redfield on Wills, pp. 84, 85; Estate of Tittel, Myr. 12.

The testator seems to have had some reason arising from his nephew's conduct for his antipathy toward him; the evidence of Kane and Post is clear upon this point, the latter especially strong, and there is other testimony to same purport, and explaining this fact as the secret of Hill's affection for the erratic youth, Conroy. Belief based on evidence, however slight, is not delusion. The testator's mind was not "possessed" in this particular: Estate of Tittel, Myr. 14.

As to the allegation of habitual inebriety, while it appears that the decedent was profound in his potations, it is not established that his habits so impaired his mind as to incapacitate him from making a will at the times of the execution

of these instruments. Notwithstanding his frequent and copious indulgence in liquor, without which he declared life not worth living, he seems to have retained an intelligence and an interest in human affairs that made him to many persons an entertaining companion. Mr. Post spent hours with him, and others visited him on account of his agreeable converse. The testimony of the physicians, Gerry, Perrault, Cachot and Dorr, is certainly worth considering, with their knowledge of Hill's habits. Upon this issue the Estate of Black, Myr. 27 et seq., is very instructive; and the work of Balfour Browne on the Medical Jurisprudence of Insanity, sections 351-360, and Dr. Ordronaux's Judicial Aspects of Insanity, 382, may be consulted with profit. The case of Peck v. Carey 27 N. Y. 9, 84 Am. Dec. 220, should also be read. Julke v. Adam 1 Redf. 456, and O'Neill v. Murray, 4 Redf. 318, are good cases in support of these views; and it is not necessary to add to those cited.

Was either will made under undue influence? Civ. Code, secs. 1272, 1575.

Counsel for contestant made strenuous contention that the circumstances surrounding Hill, at the time of the execution of those instruments, were such as to carry the inference that the wills were not the offspring or emanation of the mind of the testator; but that the craft of Counselor Haven, the arts and artifices of Aiken, and the manner in which he practiced upon the susceptible nature and the guileless heart of Hill, the subtle influence of the presiding genius of the Connor household, "the fairy godmother of the boy Conroy," Miss Maggie McCann, over the blind paralytic, and the whole atmosphere of undue influence surrounding Hill, produced the wills, by which comparative strangers acquire his estate to the disherison of the next of kin. But it does not appear that there were such ties between Woolley and Hill as should raise a presumption of obligation on testator's part to him; his life with Woolley was on the whole not a happy one; and there was a great change when the transfer was made to the Connor house; the last days of his life were made cheerful; and in this all the witnesses agree who visited Hill at his home with that family. Whatever the motive, it was the fact that Hill benefited bodily and mentally by

the change. I think a careful examination of the facts in evidence will fail to substantiate the averments of contestant that the will was procured to be made by undue influence; and it will not do to base a conclusion upon surmises and suspicions of sordid motives for kind acts, where there is no direct evidence to fortify such deduction. As to what constitutes "undue influence," the counsel must be content with citations, as everything (even a judicial opinion) must have an end. Judge Myrick's valuable probate reports furnish excellent and convenient definitions and illustrations and references: Estate of Black, Myr. 31; 1 Jarman on Wills, 132-134; 1 Redfield on Wills, 518-520; Children's Aid Soc. v. Loveridge, 70 N. Y. 387.

The opinion of Miller, J., in this last cited case is worthy of perusal: See 1 Jarman on Wills, 141; 1 Redfield on Wills, 523, 524.

The allegations of undue influence are not established, and the like remark may be made with respect to the charges of fraud: Civ. Code, 1575. Lack of time and pressure of other duties compel me to abbreviate the discussion of the principles involved in this case, and to refer counsel to the summary of the evidence to support the court's conclusion that the wills should be admitted to probate. Let an order to that effect be prepared: 1 Redfield on Wills, *435.

As to What Undue Influence will vitiate a will, see Estate of Ingram, ante, p. 122, and note.

The Appointment of a Guardian for a Person alleged to be non compos mentis, by a court having jurisdiction, is perhaps prima facie, but certainly not conclusive evidence of his lack of testamentary capacity: Estate of Johnson, 57 Cal. 529; Ames v. Ames, 40 Or. 495, 67 Pac. 737.

One may Place Himself so Far Under the Influence of Intoxicating Liquor that for the time being he cannot do any legal act, or he may, by an excessive use of alcoholic stimulants for an extended period of time, perhaps permanently dethrone his reason. A person may, therefore, by an inordinate indulgence in intoxicants, temporarily and possibly permanently incapacitate himself to make a will. Yet the fact that one is addicted to the excessive use of liquor, or that he is in some measure under its influence, manifestly does not, as a matter of law, establish a want of testamentary capacity. Nevertheless, such inebriety is always admissible in evidence as tending to

show unsoundness of mind, or vulnerability to undue influence, its effect being a question of fact for the jury: Estate of Tiffany, post, p. 478; Estate of Cunningham, 52 Cal. 465; Estate of Gharky, 57 Cal. 271; Estate of Johnson, 57 Cal. 529; Estate of Lang, 65 Cal. 19, 2 Pac. 491; Estate of Wilson, 117 Cal. 262, 49 Pac. 172; In re D'Avignon's Will, 12 Colo. App. 489, 55 Pac. 936; Estate of Van Alstine, 26 Utah, 193, 72 Pac. 942; Estate of Rathjens, 45 Wash. 55, 87 Pac. 1070.